318-0041 Sidney Ferreira and Caroline Ferreira, accounts by Gabriel Casey v. Trent Allen Owlers, Appellee by Mark Flegel and Morgan Stanley Smith Barney, LLC, Appellee by Daniel Flegelman Thank you. Casey, would you approach please? Good afternoon. Mr. Court, good afternoon. I am Gabriel Casey with the Casey Law Office representing the plaintiffs Sidney and Caroline Ferreira. A brief background on this case is that my client has invested monies through defendants and Morgan Stanley as their financial investors. They provided them over their home as Carol suffers from MS and has difficulty leaving the house. They had detailed description of their retirement plans. They were financially ready to save. They were frugal and they weren't looking to get rich. They were looking to defank rates and not lose their money. They wanted the most conservative investments possible and were willing to give all their discretion to Morgan Stanley and the investment advisors. The advisors, defendants Taylor and Coleman, said it's not a problem. It's not hard to beat a bank rate with conservative investments and keep security. They gave them a check for $250,000 and my client did sign what's called a single advisory contract on the top. It was just the SAC and a brief that was a Morgan Stanley document. A few days later, they signed other documents presented to them by Morgan Stanley. The record reflects that no documents that my client signed were executed by Morgan Stanley. The hearing is a little questionable and I want to talk about the standard of review because I went one day with it and I don't know how the court actually wants to go with it because I think it's up for debate, but they both end up at a general overview. The arguments presented by defendants at their motion to propel arbitration hearings were that, sure, we didn't execute the contracts, but we accepted them by performance, by specific performance. We opened the investment accounts at the direction of the plaintiffs, invested their money, and then made those accounts. The trial judge didn't have any affidavits or other witness testimony in front of him concerning those allegations by defendants. Typically in these cases, as this court probably well aware, we've had a few of them in the past. A case is filed and it's usually a fraud and inducement case on contract for rescission or it may be a void contract or voidable that's attempting to be avoided. But in most cases, both parties have signed the contract and there's been some or all performance under the contract. That's not the case in this situation. There is not, of all the documents presented by defendants, there is not one document that is mutually executed between Morgan Stanley and their representatives and my clients. They are all unilaterally executed. And one of the arguments that defendants make is that they should all be brought together. I'm sorry, I got off my standard of view comment. It's my understanding, and this court I'm sure has a much better understanding than I do, is that if the trial court was presented with a mutually executed contract with a mutual, not necessarily reciprocal, arbitration clause, that the judge could rule on that and wouldn't have to have an affidavit as reasonably can be constructed and it's a legal review of the four forms of the contract. That's not the case here. The judge did not state that he gave deference and took all the facts as true on behalf of plaintiffs when he made his determination. And while I asked him for specific actual findings, he just adopted all arguments and brief of the defendants. He didn't actually make any specific findings of that. So, alternatively, either the trial court didn't take all allegations of the complaints and our brief as true in the absence of any conflicting actual evidence that we could have against that presented by defendants and misapplied that as, obviously, it completely deduced that there was any acceptance by performance, or the trial judge improperly made findings in fact based on evidence that couldn't be used. So it wouldn't even necessarily be an abuse of discretion standard because where evidence isn't properly admitted or considered, the trial court wouldn't have discretion over that fact. And that's really where it all comes down to. This court talked about it in Nesmore v. Silva's operations last year, just a brief snippet that the party seeking to compel arbitration has the burden of establishing the parties have a valid agreement to arbitrate. A lot of the cases signed by defendants in their briefs at the trial court, and here talk about plaintiffs that are trying to avoid what was otherwise a valid contract in the beginning. They're saying, oh, it was fraudulent even though both parties signed it and there was some performance or something else. Our complaint does none of that. Our complaint says we had an oral agreement that was completely fraud to begin with and that other documents my client signed did not ever form a valid contract. Therefore, the burden of proving there was a valid contract ever in existence that included an agreement to arbitrate was on defendants. They submitted non-mutually executed contracts. They did not submit affidavits concerning their specific performance that can allege, and they didn't support any other evidence that I believe was properly before the trial court to find that they had accepted a contract due to specific performance. There are also a bunch of misnomers slash red herring type of arguments in cases, such as attacks on an arbitration clause versus attacks on the contract as a whole. I think we generally agree on the law, and I think this court has a good handle on that law, that yes, plaintiffs do attack both, but at the same time, we don't even have to attack those until a defendant could have met their initial burden to show this was a valid arbitration agreement. In this case, they never really got there, but we do make those arguments just because I know it's important to the trial judge and to this court concerning other factors. Concerning the actual promise to arbitrate on the unilaterally signed contract, I've made arguments, and in review, I'm not sure if they even really matter that much, because a mutual promise to arbitrate, if not executed by both parties, is unenforceable on its own. It cannot be said that there is a mutual promise that one party could accept by performance of that promise to arbitrate, because to do so, they have to be litigated against and then agree to arbitrate. It makes no sense. Both parties would have had to have signed if it was a standalone or that was the consideration of mutual promise to arbitrate. In this specific case, as one of the defendants agrees with plaintiffs, the promise to arbitrate itself, by Morgan Stanley, is illusory. As I've stated, and I direct the court's attention to the response brief of Defendant Holman. I apologize. I lost my dog here while I was writing. On page 12 of the reply brief, it states, Plaintiffs do not require a promise of any kind by defendants to force them to arbitrate any dispute that plaintiff had with them. All were, and still are, registered with FINRA, whose arbitration rule, 12-200, requires its members to arbitrate a dispute arising from business of a member if requested by the customer. That was my argument. It's been agreed to here in one of the defense's response briefs, that their promise to arbitrate is illusory in and of itself, because my clients can already compel arbitration. One of the defenses to that that Morgan Stanley makes is that that has to be invoked. So if they were to file a court against my clients, which again will never happen because they already had all of my client's money and there's no way my clients could breach anything that they couldn't just compensate themselves for and shift the burden of litigation. But regardless, if Morgan Stanley filed a court, my clients could say, we want arbitration under FINRA rule 12-200, and Morgan Stanley would have to say yes. And they're saying that's different than Morgan Stanley filing a court, and my client saying, we want arbitration under the written agreement, if it was mutual and mutually executed, and they say yes. It's not. It's the same thing. A contractual right must be enforced, the same as a rule can be enforced, and plaintiffs or any customers or clients of Morgan Stanley's don't have to enforce either. You can waive a contractual right. There's a multitude of case law on it. It's a well-understood notion. In fact, there's cases that come before this court on constructive waiver for how parties have acted when they couldn't enforce an arbitration agreement in the contract but failed to do so or answered the complaint and had to make other excuses. It really is irrelevant. But the point is that in and of itself, even if it was mutually executed, the arbitration clause failed as there's not a mutual promise of arbitration. And I'm not saying it has to be reciprocal and equal. The case law doesn't say that. The case law, such as cited by myself and some of the defense, of Visco Nova v. Winfield Nisar, which is a First District case from 2005, states that the car dealership defendant in that case, their promise to arbitrate was illusory because they had carved out exceptions for essentially every time that they had sued. So the fact of the matter is, quote, unquote, mutual arbitration attempt clauses and agreements can be illusory on one side if there's effectively no way they're going to enforce an arbitration agreement or if it's not a detriment. And because of the existence of Federal Rule 12-200, it was not a detriment to my clients. I'm sorry, to defendants under the contract. But again, getting back to the actual acceptance of the contract, the crux of my client's complaint is that they were lied to and manipulated the entire time by defendants. They came into their home and told them they would follow their investment advice or requirements and authorization. All of Morgan Stanley's arguments are that all the contracts were promised by Morgan Stanley and then under the direction of plaintiffs, they opened accounts and did investments, and that was their specific performance. Well, first off, that specific performance is not listed in the contract. The SAC, which is the first contract any Morgan Stanley investor is faced with, is, in my opinion, ripe for fraud and manipulation because it says, you can tell us anything in the future and we'll do it, and you don't have to fill anything else. We'll send you a confirmation that's lengthy and long, and it's already done at that point. So any investor at Morgan Stanley can take a client's money, after they've signed that SAC, if it's mutual ex, you can invest it anyway and claim the defense of, well, we invested it and you told us that, and they can have to hash it out. There's no reason that initial contract couldn't have included one more page or a section stating investment goals, risk policies, etc. It could have been, it's a material term, it was extremely important to my clients, it's important to every client that invests. Every client that invests has different goals, and that's the big part of having an investor to work for you, is to tell you, this is my goal, I'm saving for my kids' college, or I'm saving for retirement, and they can plan it out, and you can talk about what's your ability to absorb risk if you lose some of your investment, can you handle it, My clients have a very hard retirement method. Carol's MS is very difficult, and their number one concern was making sure that they didn't have to invest time and resources and thinking about and planning and dealing with their investments. They said, we don't care about making a lot of money, we just want to be safe in providing for it, will you do that? They said yes, and they did the exact opposite. As soon as my clients realized that, they contacted me, and they have a phone call with them, it's in the complaint, and they said, you're right, we'll change it, the defendant-tailor said, we'll change it, and they never changed it. My clients believed it was changed, because they don't understand the documents that are sent to them, and their accounts started to go up a bit. And then, down the road, when markets were continuing to be bad, and they were continuing to lose money, they had a meeting, and they made excuse after excuse as to why they were losing their account. And my clients, until both defendants-home and tailors, no longer work for Morgan Stanley, which neither one does anymore, they both were there about a year after they signed up my clients. One, I believe, was terminated, and one left, under some free will. Until they both left, and another person in Morgan Stanley got a hold of it, and said, what's going on here? My clients had no idea that their funds still were invested in prison instruction. And now Morgan Stanley wants to stand behind not one document that's mutually executed, but instead, and I believe I mentioned this here, they submitted a stack of, well, he sent these program advisements, and you signed this one thing, and we signed this, of all these documents going back and forth that say something different. And they want to say that's one contract. One of their arguments is that contracts can be integrated into each other if you specifically mention them, and they're executed by parties. And I don't dispute with that general principle. But the fact of the matter is, if the initial SAC, which is my argument, and I don't see how a court could find any other way, based on the fact it wasn't executed, and no performance was either promised under it it will follow your investment direction. Counselors, two minutes. Without that becoming a valid contract on its own, you can't have anything else that even purports to be a valid contract to come in and revive life into that document. You can't integrate a unilaterally signed, I guess, unilateral promise paper with other contracts later on because it says it. That's not how contracting works. You can put two valid contracts together through integration clauses and through other things, but you can't give life to something that was never contracted in the first place. This is a unique case, as I mentioned before, and I'll briefly touch on the public policy argument I made. I'm not arguing that arbitration clauses or arbitration is bad in general. Obviously, the court doesn't agree with that. Congress doesn't agree with that. I'm not saying that all brokerage accounts are exempt from arbitration clauses. I don't think that that's supported by the case law either. I'm saying that Morgan Stanley is such a large company that makes so much money every year that to allow this case, and many other cases likely, but a case such as this, where the actions were still extreme, and Morgan Stanley was in a position to stop all of this by having oversight over their people, by having a contract that actually said what kind of investments, and doing a quick audit of accounts, and it did not. For years, it looks like. And so the fact that you have to be knowledgeable enough in the industry to be able to read all these documents, and willing to go ahead over someone's head, over your financial advisor's head, to try to figure out if you're getting what you thought you were getting, if you're getting defrauded, Morgan Stanley can stop it all. And they make so much money every year that any amount of punitive damages for violation of the Consumer Fraud Act doesn't matter. Between 2012 and present, they make between $30 and $40 billion of profit a year. And like I said in the brief, the one year that was the highest that we reported, I believe it was $200 and something million that FINRA gave in awards for securing these issues. Even if every single one of those was against Morgan Stanley that year, it would have affected their net profit by 0.5%, not even 1%. It depends on how you run it. It could be 0.6%. But the fact of the matter is, they don't care. They'll litigate them all. They'll take every loss. It's not going to affect them. It's not going to punish or deter as punitive damages are supposed to. There are arguments in the briefs that... I understand your point, but I think the issue is really narrow here. It can be. That's not accurate. So if you have a question on the narrow issue, I'm happy to answer it. No, no, no. I appreciate your backup. But the issue really is, how do we resolve this dispute? Are you able to walk into a courtroom or must you resolve it in arbitration? Or am I missing the point? That is the point, Your Honor. But the first dispute we're having is, how do we resolve the dispute if it should go to arbitration? Okay. So my public policy argument isn't how we solve the dispute if it should go to arbitration. It's that if it has to go to arbitration and gets one more bite at the apple to try to get kicked back to court under arbitration, it's possible, yes, but it shouldn't have to go there in the first place. Again, defendants failed to prove their burden. They never proved there was a valid contract. It isn't like the other cases before this court and other courts where you have a valid contract. Before I stop, I know I'm almost out of time. You do agree there are documents signed by Morgan Stanley? I agree that there are documents signed by Morgan Stanley that were sent to my clients, yes. That refer to the arbitration agreement? Yes. But your position is, I mean, those are only signed by Morgan Stanley and not by your client.  There is no document that is mutually exclusive. Okay, all right. I understand your argument. I don't mean to take the wind out of your sails. Thank you. One last thing, Your Honor. I'm sure I'm out of time. This was cited by Defendant Ehlers in his circuit court brief, but not in his appellate brief. It was a landmark properties case. It's a 1988 case. I don't have the district. I apologize. But it was cited for the fact that even if you have an oral agreement with someone and then you send them a written contract, the party that you send the written contract to, signed by one party, can be accepted by specific performance. And it was an arbitration agreement case as well. I think it's fairly on point. It's the complete inverse of what happened here. In Landmark, it was someone providing services, I don't know if it was a home or business, but, you know, you pay me, I'm salaried, I will give you services. They talked about it to the person, and the contractor said, I'm not comfortable with our oral agreement, I want to make sure it's documented so I know what I'm providing and what they're getting. So they wrote out the contract with the specific, it had more specifics in it, and submitted it to the plaintiff. And the plaintiff emailed them back, never signed it, lettered, emailed back, and said, we accept it, we do all those services in there, we'll pay you the money. And then the party did all the work in there. And they said, you can enforce that arbitration agreement. I completely agree, it's the exact opposite. They had a very specific investment agreement, very specific investment agreement, and then they had to sign a general contract that had no specific performance in it, and you cannot accept by specific performance with fraud, because they were never authorized or directed to open those moderate to high-risk investment accounts, so they cannot accept by that specific performance. Thank you. Thank you, Mr. Casey. Mr. Flavel, are you going first? That's correct. Good afternoon. Thank you. My name is Mark Flavel, I represent one of the affilies, Mr. Baylor's, and I appreciate you listening to this argument today. I think the appellant in this case is blatantly trying to foreign shop. It's clear from his brief that he wants this case to stay in court, in trial court. He doesn't want this going to arbitration. He's even argued that there's, for his client, arbitration is bad, that his client won't be able to collect punitive damages. All the, you know, those... Attorneys' fees, right? Pardon? Punitive damages include attorney's fees. Including attorney's fees. So there's... Bad for his client, maybe bad for him. Correct. Either way, that's not the issue we're arguing today. We're not arguing about whether arbitration is good for his client or not. We're arguing whether there's a valid arbitration clause in multiple agreements that his client signs for a period of... for advisory service by Morgan Stanley. My client, Mr. Baylor's, performs advisory service, financial advice to his clients for 20 months, and provided those services to the best of his ability, pursuant to Morgan Stanley's corporate policy, and Morgan Stanley... They were reps for Morgan Stanley. My client was a rep for Morgan Stanley. It's irrelevant whether there's... He goes into the merits of the case right now, but that's really not the argument, and I don't want us to kind of veer off to that. I think that we should... If he does have an argument based on the contract itself, that there may be some validity, but I didn't hear anything. What I heard was that there was... There was a contract that wasn't signed by Morgan Stanley initially. He's saying that it's not... Those contracts weren't valid because they didn't invest the money according to the agreement, so there's no meeting of the minds. So if that is the case, is your argument that that doesn't matter, that the arbitration clause would still be valid even if they never reached an agreement through these writings? Yeah, that's a good question. You know, I think my client would disagree that there was any fraud here, or there was any wrongdoing, but beyond that, the contract specified for advisory services were an ongoing relationship as a fiduciary to his clients. The services that were provided, that were required to be provided, did not specify what investments, what was going to be invested, what the products were. This was a contract to provide services. Those services were provided. If the plaintiff's applicants want to make that argument that the services that they asked for weren't provided correctly, it sounds like he wants to make that argument, and he can make that in arbitration. Those are disputes within arbitration, within FINRA, that are generally resolved. There's no reason why this court, or any court, needs to hear those arguments at this point when the trial court judge has already ruled that there was a valid contract that stated that there was an arbitration clause that even the trial court judge asserted was in bold. Didn't he say that he found that the arbitration clause was valid, and did he also then say, and these contracts were valid based on their agreement, or just they appear as if they were... I mean, because, like you said, there are no terms. Well, there are no terms. It's a general... And Morgan Stanley's counsel can attest to that more because he represents the firm. My client, Mr. Ehlers, was a financial advisor for Morgan Stanley, and those contracts generally are... I would argue that more than... signed by the client to begin the process. That was the single advisory, but inside the single advisory contract, there was an incorporation clause, meaning all the other contracts preceding that are due to enforce the earlier one. So it was a relationship, and the relationship was obviously signed by plaintiffs, and they went for 20 months without any dispute or any argument on their side that they weren't providing services. The services were provided, and there was nothing... There was no argument that that... Whether Morgan Stanley didn't sign the single advisory contract is really irrelevant at this point. I mean, plaintiffs' counsel cited a case where... The Landmark case where you don't need both signatures for both parties, but by performance, that constitutes a contract. Obviously, 20 months of service is bad for performance. There's nothing in the contract that states that a certain investment type or risk tolerance is necessary. That's not what you're signing up for. You're signing up for services of fiduciary as part of the fiduciary contract for Mr. Ehlers or the other financial advisor, Holman, to provide services for, which they did. Counsel, there's one minute. So when somebody comes in, when somebody meets with Mr. Ehlers, and they have this contract, is there some explanation given to them about what the services are that are going to be provided? Well, you talk, like any business, when you're signing up with anyone, you talk to a lawyer, for instance, and you sign up with them for them to represent you. You may have a general idea that they're going to provide legal services for you, and they're going to represent you in some sort of legal proceeding, but they're not going to go over before you're signing every little detail of their investments what's going to happen. It's a whole portfolio. You have to look at all the facts surrounding the market. There's a lot of factors, and to be honest, I don't think a court is able to really determine that or understand it as much as an industry, self-regulatory industry like the financial, for instance, like FINRA. Those are issues that need to be addressed by the industry and what is a proper investment. And frankly, I can see why the plaintiffs don't want it to be in arbitration. They have their own arguments, but Patrick calls for arbitration like any other advisory contract that anyone's ever signed. If you meet with someone, sorry, if you meet with someone and they tell you, we really don't know anything about this and we don't have time to deal with them on our own and we'd like to put this in your hands, is there some explanation that comes along with what's going to be done by the advisor and what isn't? Of course. There's industry regulations. I mean, as a fiduciary, you need to keep your clients apprised of what's going on, provide account statements, which they're all provided for 20 months in the relationship. And again, that's kind of bearing off the point of the contract. The contract's a relationship for services. And those services are broad, but whether you like the services or not, that needs to be decided by the arbitration because there is a valid arbitration panel or clause in the contracts. Thank you. Thank you. Mr. Hildebrand? Good afternoon. Good afternoon. It pleases the Court, Dan Hildebrand, to agree with the charge for Morgan Stanley. I'd like to try to get right into some of the questions Your Honors have been asking and get into the record about the relationship between the single advisory contract signed by the Carreras and the program agreements signed by Morgan Stanley because they are one integrated agreement and they speak quite clearly within the agreement as to how they relate. So when the plaintiff signed the single advisory contract, it says right up above their signature, this agreement is subject to a previous arbitration clause. Section 2 of that agreement, Section 2 of the single advisory contract says Morgan Stanley will provide you with a program advisory plan and they will provide you with program agreements. Okay? The single advisory contract also says, right underneath the actual arbitration provision that they saw and signed their names under, please note that a copy of this arbitration provision is contained in each program agreement which will be provided to you upon accountable payment. So the single advisory contract tells the client exactly what's going to happen. If they agree to arbitration, you're going to get a program agreement which explains what we're going to do for you. Okay? And that program agreement has an arbitration clause in it. Okay? Is the program agreement marked as Exhibit 1? Um... I can give you a C, Dr. DeSoto, to remember the... I believe the single... I just don't want to reference the... C-51, perhaps? But the, um... the key sites in the program agreements, um... if you want to see Morgan Stanley's signature on the program agreements themselves, those are at C-89, C-108, C-122, and C-139. Another thing I want to emphasize, you know, because I want to defend my client's business practices, when they send the program advisory confirmation, it's got a simple four pages. First page has risk profile. It's three times. They get three program agreements. The very first page under the cover letter says risk profile, so it's not like they're operating in the dark. Okay? Morgan Stanley did exactly what the single advisory contract said they would do. They provided an advisory program confirmation. That confirmation clearly stated the risk profile for each contract, which was listed in moderate. There's no citing of it to the record. And they attached the program agreements themselves, which, like they said in the single advisory agreement, contained an identical arbitration provision that was executed by Morgan Stanley. But those, the agreements that are listed as moderate, they were signed by your client. They're not signed by plants. You know, that's true, but can I finish my question? Then there's no, in the SAC, there is no written documentation about what their expectation was. And so their expectation is, they've alleged, is that it was to be low, low risk profile. But what they got was a moderate risk profile, which was sent to them, and they don't sign. And you say, well, the performance is the agreement. But if they are unaware of what, you know, of what is actually being done, don't you need, when you change the terms of something, if they said low and you said a moderate, don't you have to have some recognition of that? What was said is an oral dispute. Okay? I'm sure Morgan Stanley's representatives believed they were sending program advisory contracts that were consistent with what they thought the clients wanted. But none of that really matters because the single advisory contract contains an express incorporation reference of the program agreements. It doesn't just say we're going to do it. It says, okay, this is a C21, okay? Boldface, single advisory contract. By signing this agreement, you agree that all the terms and provisions of the program agreements that you receive are incorporated by reference into this agreement as though they were fully set for a period when you signed the agreement. C21. So the single advisory contract expressly incorporates the terms of the program agreement. Illinois law allows that and treats those as an integrated contract. The other reason this doesn't really matter is even if there's no meetings at the law meeting at the lines, Illinois law is clear that all that's required to enforce an arbitration agreement is a mutual promise of arbitration. Both clients signed, so both parties signed an identical agreement to arbitrate their disputes. It reads exactly the same. So if there is any dispute about whether there was mutuality or performance or meeting the lines, that twin mutual agreements of arbitration means this has to go to arbitration. And the other predictive reason none of this really matters is the plaintiff's fundamental argument goes to the validity of the contract. Okay? A challenge to the validity of a contract with an arbitration clause black-letter law is for the first instance for the arbitrator to determine. So, you know, I haven't even gotten into performance, but the record before the trial court contained evidence of an integrated agreement, program agreements bound with a single advisory contract. They were both, they were signed, it's a comprehensive integrated agreement signed by all the parties, and so it was appropriately found based on that record that there was, I believe it was, an appropriate contract and appropriate arbitration. You know, performance and ratification, a couple other reasons why you can confirm. The plaintiffs are the ones who allege performance in their complaint. You don't need a math or data. They give you the date for how long they had used Morgan Stanley Services. The trial judge also had account statements from Morgan Stanley in front of the record reflecting that they performed the agreement by sending them account statements. You know, and the idea that this was all sort of pulling the wool over their eyes, they actually changed one of their program agreements. So they sent the first agreement and there was some sort of conversation and the record shows a fourth program agreement which was a substitute for one of the initials. So, you know, the record is transparent. There's, you know, there's a lot of agreements in there but the fundamental simple fact is the plaintiffs signed the same advisory contract. Single advisory contract incorporated by reference. All the terms of the program agreement. Counsel, that's one minute. Morgan Stanley signed the program agreement and, you know, that record right there alone is, it gets you there on, the contract gets you there on the performance and that's just all, you know, let's see what it has to do with. Your Honor, do you have any other questions or concerns that you'd like me to address? The single advisory contract does have a signature line for Morgan Stanley. It does. How does that get missed? I don't know. It's pepsin, Your Honor. It's pepsin. You wouldn't be here today if it hadn't been executed. Plaintiffs don't sign leases a lot. I mean, you know, we've all, we've all been there. It's just, I don't know what happens. And the client agreements that went out and signature pages do bear the signatures of the investors? Yes. The investors signed Were they signed after the oral agreement? After the, I'm sorry, was there a date difference between the, I can check the record. I can check quickly but it's back at the table. Okay. I don't remember the date of execution of the client agreements. But they signed the client agreements. They signed the new share of certification. Those both reference the concept of arbitration. But I really think the important thing is, the single most important thing is the reference in the single advisory contract incorporated in terms of the program agreement. And Morgan Stanley performed Section 2 of the single advisory contract by sending the claims that advisory program that stated the risk profile. It's four pages long. If it was wrong, they could have read it and picked up the phone. Okay. It's not that complicated. I guess there wasn't time to assume there was anything further. Okay. Thank you Mr. Hildebrand. Mr. Casey Rebaba. Thank you Donna. In answering the questions this court was just asking why did they sign the contract? Because they're not concerned with what the contracts say or performing in the contract. The defendant's only concern is that they used as much money from as many people as they possibly could and they're investing it to maximize their profit. Both as the investor and Morgan Stanley profit. They both benefit from these types of schemes and the fact that they sent an advisory program confirmation is an ancillary service. The only material thing for my clients was that Morgan Stanley would open accounts and conservatively invest their funds as authorized, as directed. Morgan Stanley states in the hearing record page 12, 8-8, lines 12 to 15, single advisory contract, at the plaintiff's directive, they, which is Morgan Stanley, would open advisory accounts and that is exactly what transpired here. It is not. My clients never authorized the opening of multiple accounts in moderate to high risk and the defense counsel said well they could have picked up the phone and called when they got the call.  they did not have the advisory programs, that's literally what they did. It's in the complaint. From the complaint, paragraph 46, plaintiff received an advisory program confirmation from Morgan Stanley, paragraph 50, Carol called Ehlers on 2, 3, 2015, and both plaintiffs called him on a later date, eight days later, to discuss the advisory program confirmation, paragraph 51. Plaintiffs stated that the advisory programs and their associated specifics were against plaintiff's investment goals, previous instructions, and what they orderly agreed to was a written contract. I'm saying they had an oral contract. Morgan Stanley wants these to be contracts. They want to stand behind it, but it's simply not. When did your clients tender the $250,000? On 11-19, 2014, my clients both signed the SAC and gave the check to the defendants. The next day, the other two documents sent were signed by my clients. All of these before they received these advisory programs stated that the money was not invested. Maybe one account was changed. It was changed on January 29, 2015. You're saying during that entire period of time, there's no contract? Correct. They want to say that the SAC is a valid and enforceable contract. They keep trying to pull this argument into the fact that plaintiffs have to show that this is a valid agreement. They never got there. They never got to the fact that there was a valid contract and arbitration agreement. I can't have a client sign a contract unilaterally and then send whatever I want to them and we sign it and then they're one contract and that's the whole contract. Counselor Clegg will mention legal services. You don't go into a lawyer and contemplate having a lawyer for you to sign up. That's not true. I can't just have a guy come in with a speaking ticket and I say sure, here's my contract. It says I'll provide legal services and you'll pay me $15 an hour. And then I go spend $15 drafting wills for the guy he never asked for and give it to him and say well you signed a contract that provides legal services at this rate. Contract doesn't specify, I've got arbitration clauses, I've got integration clauses, fight me in court. That's what's going on here. They're trying to use this to be able to do whatever they want with clients and it's not just punitive damages amounts. It's the fact that they can argue the client has a lot of assets so even though they ask for conservative investments technically these moderate to high risk accounts were conservative based on what   asking for. So I'm a little passionate about this and I have a lot of time on this for a long time. This isn't an effective form job. Of course we want it to be real. The other reasons that are apparent is that a jury is going to actually be able to get up and give these clients what they need. And additionally one thing that Scott mentioned is that a record of law of how the decisions development of case law and what the case law is is a record of what    is. So the jury is going to give them a record of what the case law is. And the   going to make  decision as quickly as possible. ?? ?? ?? ??